IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

STEVEN LUCERO,

Petitioner,

v. No. 2:23-cv-00180-DHU-JHR

GEORGE STEPHENSON, et al.,

Respondents.

**PROPOSED FINDINGS AND RECOMMENDED DISPOSITION ON PETITIONER'S PETITION FOR A WRIT OF *HABEAS CORPUS* UNDER 28 U.S.C. § 2254**

THIS MATTER comes before the Court on Steven Lucero's Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus. [Doc. 1]. District Judge David H. Urias referred the petition to me for proposed findings and a recommended disposition on December 01, 2023. [Doc. 12]. Respondents filed an answer addressing the issue of exhaustion and addressing each claim on the merits. [Doc. 13]. Steven[1] filed a response. [Doc. 21]. Having reviewed the briefing, case record, and applicable law, I recommend the Court DENY Steven's Petition and DISMISS this matter with prejudice.

## I. PROCEDURAL BACKGROUND

### A. Steven's Three-Day Criminal Jury Trial.

On September 16, 2014, the State of New Mexico charged Steven with first-degree (willful and deliberate) murder or, alternatively, felony murder (Count 1); conspiracy to commit felony murder or, alternatively, to commit first-degree (willful and deliberate) murder (Count 2); tampering with evidence (Court 3); and armed robbery (Count 4), in connection with the June 4,

[1]Although the Court ordinarily refers to individuals by their last names, it will use first names throughout for consistency and clarity because Steven Lucero shares a last name with both the State's key witness, his ex-wife Vanessa, and his brother, Gilbert, who was tried separately as a co-defendant.

2014, murder of Isaiah Sanchez and the theft of Isaiah's pickup truck, wallet, and other items. [Doc. 13-1 at 1–2]. Robert E. Tangora represented Steven at his criminal jury trial in state district court and on direct appeal to the New Mexico Supreme Court. At jury selection, the state district court offered prospective jurors the opportunity to answer questions privately in chambers. [Doc. 14-1 at TR-27, TR-108].

Specially, the court explained:

> "[I]f there is a question that you would like to answer privately, at the end of questioning, I'll give you an opportunity to line up … and one by one we'll call you back individually into chambers to let you tell us privately what you would like for us to know. So please keep that in mind while you are being questioned."

[Doc. 14-1 at TR-27–28].

Eight prospective jurors accepted the court's offer to speak privately, with seven raising medical, familial, or work-related concerns. [*Id*. at TR-109–16]. Prospective juror number 100, however, reported she was "very familiar with [Steven's] family", so the court excused her for cause. [*Id*. at TR-111–12, TR-124]. The court then swore in twelve jurors and two alternates, [*see id*. at TR-134–37], and once the jury returned from the lunch break the court began taking testimony. [*Id*. at TR-140–41, TR-144–53].

Steven, the Defendant, was back together with his ex-wife Vanessa Lucero at the time of the murder. [*Id*. at TR-176–78]. Before getting back with Steven, Vanessa had been dating Isaiah, the victim. [*Id*. at TR-177]. Steven and Vanessa were living with their friends Timothy and Michelle Emerson. Gilbert Lucero, Steven's brother, and Sheri Sanchez, Gilbert's girlfriend, had recently been evicted from the residence where the murder occurred. [*Id*. at TR-178, TR-186–87]. The State's evidence showed that Defendant—with the help of Gilbert, Sheri, and Vanessa—beat, stabbed, and killed Isaiah in the course of stealing his truck and his wallet.

On June 3, 2014, at Steven's request, Vanessa met Isaiah at a local bar around midnight to buy methamphetamine from him. [*Id*. at TR-180]. Vanessa was driving Michelle Emerson's Chrysler with Sheri in the passenger seat and Steven and Gilbert "ducking down" in the backseat. [*Id*. at TR-202]. According to Vanessa, Steven planned at that time to steal Isaiah's GMC pickup truck, remove the engine, and install it in his own Chevrolet pickup, which was not then running. [*Id*. at TR-182, TR-198]. Once Vanessa made the buy and returned to the Chrysler, Steven and Gilbert, both of whom were carrying firearms and folding pocketknives, exited the vehicle with a plan to approach Isaiah from behind and take his truck. [*Id*. at TR-180–83, TR-187–88]. However, believing that someone was coming toward them, Steven and Gilbert abandoned their plan; got back in the Chrysler; and the four drove away. [*Id*. at TR-183].

Steven and Gilbert then instructed Sheri to use her cell phone to call Isaiah and invite him "to go party" with her and Vanessa at 1812 North Maryland. [*Id*. at TR-183–84]. Upon arrival, Vanessa, Sheri, and Isaiah entered the residence while Steven and Gilbert remained in the backseat of the Chrysler. [*Id*. at TR-185]. As Vanessa and Isaiah followed Sheri from the back of the house to the front, however, Vanessa noticed Steven and Gilbert "in the corner." [*Id*. at TR-186–87]. Steven and Gilbert then "nudged [Vanessa] to the side[,]" and began beating Isaiah. [*Id*. at TR-187]. Vanessa heard two gunshots, then watched as Steven and Gilbert stabbed Isaiah. [*Id*. at TR-187–89].

Vanessa and Sheri left the house when "the guys . . . told [them] to go take off to go make sure there was no cops coming around." [*Id*. at TR-189]. Steven and Gilbert then took Isaiah's truck, called Vanessa and Sheri, and had the women meet them in another area of town. [*Id*. at TR-190]. But when Steven realized that a part of his gun had detached, the group got back in the Chrysler and returned to 1812 North Maryland to search for the missing piece. [*Id*. at TR-190–91].

Vanessa walked to the front door but did not enter the home. [*Id*. at TR-191]. From the door, she could see Isaiah lying on the floor "[g]asping." [*Id*.]. Steven and Gilbert told Vanessa and Sheri to wait for them down the street. [*Id*.]. After approximately ten minutes, Vanessa and Sheri picked up Steven and Gilbert, who now were in possession of Isaiah's wallet, which held $15, and his shoe. [*Id*. at TR-191–92]. Steven told the group that he and Gilbert stabbed Isaiah again because "[t]hat fucker was still breathing." [*Id*. at TR-192, TR-201–02].

Vanessa said that after Steven and Gilbert changed clothes, they put their original clothes, their guns and knives, and Isaiah's shoe in a garbage bag that they then threw into the Pecos River. [*Id*. at TR-193–94]. Vanessa and Steven dropped Sheri and Gilbert at their home and returned to the Emerson residence. [*Id*. at TR-194].

Approximately one week later, Vanessa accompanied Steven as he transported Isaiah's truck to his friend Daniel Madison's mechanic shop. [*Id*. at TR-194–95]. After that, she watched as Steven removed the engine and all four rims from Isaiah's GMC pickup and installed those parts in and on his Chevy pickup. [*Id*. at TR-197–200].

Though Vanessa's trial testimony was unquestionably critical, neither it nor her credibility went unchallenged. To the contrary, she acknowledged having lied to law enforcement as well as having made four inconsistent statements during the course of the investigation, including one during which she claimed that Steven had shot Isaiah. [Doc. 14-2 at TR-9–11]. She further admitted that she initially concealed her identity from law enforcement. [*Id*. at TR-15]. Vanessa also confirmed that she had ingested and shared crystal meth on the night in question, activity for which she was not charged. [*Id*. at TR-14–16].

For her part, Sheri disclaimed any involvement in the events of June 3–4, 2014: she denied having seen Vanessa or Steven that night, claimed not to have gone to either the local bar or 1812

North Maryland, and insisted that she and Gilbert were home doing plumbing repair at the relevant time. [Doc. 14-3 at TR-7–9].

Daniel Madison confirmed that Steven did mechanical work at his place, including replacing the engine in his pickup. [Doc. 14-2 at TR-27–28]. However, contrary to what Vanessa had said about Steven's truck not running, Daniel testified that Steven's pickup was operable and that he was able to "drive it every day." [*Id*. at TR-33–36].

Detective Scribner also cast doubt on some of Vanessa's testimony. For example, where Vanessa had testified that at least two gunshots were fired at 1812 North Maryland, Detective Scribner said that he recovered no projectiles from the residence, could not verify Vanessa's claim, and "did not see anything at the scene that led [him] to believe that there were shots fired there[.]" [Doc. 14- 2 at TR-117]. Further, notwithstanding several dive-team searches, Detective Scribner never found the garbage bag that Vanessa said was thrown into the Pecos River.[2] [*Id*. at TR-110–11].

Steven also took the stand. He testified that he and Vanessa divorced because "[s]he had a bad drug habit[]" and "was stealing stuff." [Doc. 14-3 at TR-17]. He denied knowing or meeting Isaiah and testified that he had not even heard the name until Vanessa's cousin told Steven that Isaiah had hit her. [*Id*. at TR-23–24]. Steven admitted that he lied to Detective Scribner when he told the detective that an individual he knew only as "Richard" offered to sell him Isaiah's pickup for parts. [*Id*. at TR-30]. He said he lied because Vanessa gave him the truck and he "didn't want Vanessa in trouble more than she already was." [*Id*. at TR-25–27, TR-30]. Steven denied that he killed Isaiah, threw a garbage bag of evidence into the Pecos River, or was at 1812 North Maryland

[2] Detective Scribner also testified that the dives occurred approximately 4–6 weeks after the murder and following heavy rainfall which created dangerous diving conditions. [Doc. 14-2 at TR-111].

on the night in question. [*Id*. at TR-27–28, TR-31]. When asked if he remembered where he was on the evening of June 4, 2014, Steven responded, "No, I can't recall where I was." [*Id*. at TR-32].

The jury found Steven guilty of first-degree felony murder; conspiracy to commit first-degree felony murder; and armed robbery. [Doc. 13-1 at 21, 25, 31]. The jury acquitted him of tampering. [*Id*. at 29]. On August 16, 2016, the state district court dismissed the armed robbery charge to prevent double jeopardy and sentenced Steven, a habitual offender, [*see id*. at 35–36], to a term of life imprisonment plus ten years. [*Id*. at 37–41].

**B. Steven's Direct Appeal.**

Because of the first-degree murder conviction, Steven appealed directly to the New Mexico Supreme Court, *see* Rule 12-102(A) NMRA, arguing, as is relevant here, that the evidence was insufficient with respect to each conviction. [Doc. 13-1 at 42–62, 123–45]. On February 19, 2018, the state supreme court affirmed. [*Id*. at 168–187].

**C. Steven's State Habeas Petitions.**

On June 11, 2018, Steven filed a *pro se* state habeas petition asserting that: (1) counsel was ineffective; (2) he was subjected to prosecutorial misconduct as the State pursued a "vindictive prosecution of a weak case based on presumptions and unsupported by meaningful and factual evidence[]"; (3) convictions supported by insufficient evidence denied him due process; and (4) there was "inappropriate juror misconduct during voir dire" because "three jurors told defense counsel if Defendant did not testify they would find him guilty because he would be hiding something." [Doc. 13-1 at 208]. Steven also claimed to be actually innocent because "another person killed the victim." [*Id*. at 200].

The state habeas court summarily dismissed all but Steven's ineffectiveness claim. [Doc. 13-1 at 214–19]. Appointed habeas counsel thereafter amended the petition to argue that Robert

Tangora's failure to call (1) Timothy and Michelle Emerson as witnesses with exculpatory information, and (2) Steven's friend Maria Torrez as an alibi witness, constituted ineffective assistance of counsel. [*Id*. at 252, 256]. Steven theorized that because the Emersons testified at Gilbert's later jury trial at which "[t]he State presented substantially the same case[]" and Gilbert was acquitted, the result of Steven's trial would have been different had counsel called the Emersons to undermine Vanessa's testimony. [*Id*. at 260–272]. Steven claimed that Maria Torrez would have testified that she was with him "from approximately 8pm until 7am" on June 3, 4, and 5, 2014. [*Id*. at 272].

The court conducted an evidentiary hearing on April 30, 2021, and heard from Maria, Steven, and Detective Scribner. [Doc. 13-1 at 284–85]. The court denied the amended petition. [*Id*. at 288–89]. The Court found that Tangora made a "sound decision" in deciding not to call the Emersons to testify at Steven's trial. [*Id*. at 288]. The court also found that both Steven and Maria's testimony at the evidentiary hearing was not credible. [*Id*. at 289].

Steven filed a timely petition for writ of certiorari, which the New Mexico Supreme Court denied by *Order* of July 6, 2022. [Doc. 13-1 at 300–13]. Steven did not file a petition for writ of certiorari to the United States Supreme Court.

**D. Steven's § 2254 Petition.**

On February 24, 2023, Steven signed and deposited for institutional mailing his 28 U.S.C. § 2254 petition. Because Steven filed his petition after April 24, 1996, it is subject to the terms of the Antiterrorism and Effective Death Penalty Act (the AEDPA). For purposes of the "in custody" requirement of 28 U.S.C § 2254, Steven was in custody at the time he filed the petition and remains in custody as of today's date.

## II. STANDARD OF REVIEW

Under 28 U.S.C. § 2254, a federal court may only grant a state prisoner's petition for a writ of habeas corpus when the prisoner is held "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). In general, the prisoner must also have exhausted his state court remedies. 28 U.S.C. § 2254(b)(1). When the prisoner's claims have been adjudicated on the merits in state court, a Section 2254 petition can only be granted if the state court's decision was contrary to, or unreasonably applied, "clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court decision is "contrary to" clearly established federal law "if the state court applies a rule different from the governing law set forth in [United States Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state court decision "unreasonably applies" clearly established federal law if it "correctly identifies the governing legal principle from [United States Supreme Court] decisions but unreasonably applies it to the facts of the particular case." *Id.* "Where … the state court's application of governing federal law is challenged, it must be shown to be not only erroneous, but [also] objectively unreasonable." *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003); *see also Woods v. Donald*, 575 U.S. 312, 316 (2015) ("[A]n unreasonable application of [United States Supreme Court] holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice.") (quotation marks omitted). "Evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-

by-case determinations." *Welch v. Workman*, 639 F.3d 980, 1010 (10th Cir. 2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)) (brackets omitted).

Federal review of a state court's determination that a claim lacks merit is "highly deferential." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti,* 537 U.S. 19, 24 (2002)). "[F]ederal habeas relief [is precluded] so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough*, 541 U.S. at 664.). The state court need not cite to United States Supreme Court cases, or even be aware of them, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). Indeed, "determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning" at all. *Harrington*, 562 U.S. at 98. Unless the state court indicated that it did not consider an issue on the merits, even a summary denial will be deemed "on the merits" for purposes of Section 2254 review. *Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004); *see Cullen*, 563 U.S. at 187 ("Section 2254(d) applies even where there has been a summary denial."); *Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999) ("[W]e owe deference to the state court's *result*, even if its reasoning is not expressly stated.").

Review under Section 2254(d) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, 563 U.S. at 180–81, 185 n.7; *Black v. Workman*, 682 F.3d 880, 895 (10th Cir. 2012). Such review must be "highly deferential," and the petitioner bears the burden of proof. *Cullen*, 563 U.S. at 181; *Woodford,* 537 U.S. at 24–25.

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable. If this standard is difficult to meet, that is because it was meant to be…. [Section] 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. It preserves authority to

> issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further. Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.

*Harrington*, 562 U.S. at 102–03 (citation and quotation marks omitted).

In Section 2254 proceedings, "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Welch*, 639 F.3d at 991 ("We presume the factual findings of the state court are correct unless the petitioner rebuts that presumption by clear and convincing evidence.").

I will consider Steven's claims against the foregoing standards.

## III. ANALYSIS

Steven asserts four grounds for relief: (1) he was denied a fair trial because of the manner in which the state district court conducted voir dire, (2) the evidence was insufficient to support the convictions, (3) Robert Tangora was ineffective in failing to call the Emersons and Maria Torrez as witnesses, and (4) the State committed prosecutorial misconduct and pursued a vindictive prosecution. [Doc. 1 at 5, 7–8, 10].

### A. Ground One: Voir Dire

#### *i. Exhaustion Requirement*

Steven argues that he was denied a fair trial because the state district court did not permit him to individually and privately question prospective jurors who indicated that they had personal experience with him or with a State witness. [Doc. 1 at 5]. In his notice of appeal and statement of issues filed with the New Mexico Supreme Court, Tangora identified individual voir dire and insufficient evidence as issues for appeal. As to voir dire, he specifically argued:

> Given the personal and prejudicial nature of the charges, Defendant requested individual voir dire of each prospective juror who indicates that they have personal experience with the Defendant or State witnesses. Given the likely personal and private nature of the responses, a fair trial requires that Defendant be permitted to ask questions of the prospective juror in a private environment.

[Doc. 13-1 at 49–50].

That argument is nearly identical to the claim Steven raises here. [*Compare* Doc. 1 at 5 *with* Doc. 13-1 at 49–50]. But after filing the notice of appeal and statement of issues, Tangora's brief in chief presented only three grounds for reversal: (1) insufficient evidence, (2) an improper jury instruction on conspiracy, and (3) cumulative error. [Doc. 13-1 at 174]. The New Mexico Supreme Court likewise understood these to be the three grounds presented for its review, explaining that it "discern[ed] from Defendant's briefs" those three issues. [*Id.*]. The court affirmed Steven's convictions without addressing the voir dire issue. [*Id.* at 186–88].

Steven subsequently raised a voir dire-related issue in his *pro se* state habeas petition, but only in connection with an allegation that three jurors had told defense counsel that they would find him guilty if he did not testify because his failure to testify would indicate that he was "hiding something." [Doc. 13-1 at 208–09]. The state habeas court summarily dismissed the claims concerning insufficient evidence, the conspiracy instruction, and cumulative error because those issues had already been adjudicated by the New Mexico Supreme Court. [*Id.* at 217–18]. The court permitted Steven to proceed only on his ineffective-assistance claim. [*Id.* at 218].

In his *pro se* revised habeas petition, Steven again referenced voir dire in support of his ineffective-assistance claim, asserting that he had informed Tangora that "numerous individuals on the jury pool [were] familiar to Defendant and/or his ex-wife, Vanessa Lucero, or they had ties to law enforcement, or were familiar with the prosecution team." [*Id.* at 234]. He specifically identified jurors 38, 63, and 66 as having been "selected despite having reasons to be disqualified."

[*Id.*]. After counsel was appointed, however, Steven's amended petition focused exclusively on whether Tangora was ineffective for failing to call certain exculpatory and alibi witnesses. [*Id.* at 252]. Following an evidentiary hearing, the state habeas court denied that claim. [*Id.* at 288–89]. Steven did not obtain a state-court merits ruling on the voir dire claim he now presents.

"A threshold question that must be addressed in every habeas case is that of exhaustion." *Harrison v. Champion*, 15 F.3d 1538, 1554 (10th Cir. 1994). Pursuant to 28 U.S.C. § 2254, "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court *shall not* be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . ." 28 U.S.C. § 2254(b)(1)(A) (emphasis added). The petitioner must pursue the claim through "one complete round of the State's established appellate review process," but so long as the claim was properly presented the state courts need not have addressed it. *Selsor v. Workman*, 644 F.3d 984, 1026 (10th Cir. 2011) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)); *Fontenot v. Crow*, 4 F.4th 982, 1019 (10th Cir. 2021).

Exhaustion does not require precise citations, formal terms, or presentation of the claim in identical form to the petitioner's state filings. *Grant v. Royal*, 886 F.3d 874, 890–91 (10th Cir. 2018). Instead, the petitioner must have given the necessary facts, legal principles, and arguments for the claim such that the state courts could have identified and addressed them. *Id.* A petitioner may adjust his habeas claims or add "bits of evidence" for federal review so long as they are not presented in a "significantly different and stronger posture," either factually or legally. *Jones v. Hess*, 681 F.2d 688, 694 (10th Cir. 1982). However, it is the petitioner's burden to establish exhaustion, *see, e.g., Lackawanna County Dist. Atty. v. Coss*, 532 U.S. 394, 404 (2001), which applies equally to claims and sub-claims. *See Jernigan v. Jaramillo*, 436 Fed. Appx. 852, 855–56 (10th Cir. 2011).

Respondents acknowledge that Steven's voir dire claim presents a potential exhaustion problem because, although Ground One "repeats nearly verbatim an issue that Steven raised in his direct-appeal statement of issues," [Doc. 13-1 at 49–50], he did not renew that issue in his brief in chief. [Doc. 13 at 17; Doc. 13-1 at 123–45]. Respondents nevertheless ask the Court to follow *Revilla v. Gibson*, 283 F.3d 1203, 1210–11 (10th Cir. 2002) and bypass the exhaustion question in favor of resolving the claim on the merits. [Doc. 13 at 17].

The Court will do so. Even if Steven exhausted this claim, it plainly fails on the merits. *See Revilla*, 283 F.3d at 1210–11 (permitting a federal court to bypass a difficult exhaustion question and deny an unexhausted claim on the merits when the claim plainly lacks merit).

*ii.* *Analysis*

"[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Due process means, in pertinent part, "a jury capable and willing to decide the case solely on the evidence before it[.]" *Smith v. Phillips*, 455 U.S. 209, 217 (1982). Further, "[a] federal habeas court may reverse a state trial court's findings of juror impartiality only upon a showing of manifest error." *Steven v. Kerby*, 133 F.3d 1299, 1308 (10th Cir. 1998) (internal authority omitted).

Steven has not made that showing. Most importantly, he does not identify any juror who served and who was unable to remain impartial. Nor does the voir dire transcript support such a conclusion.

The twelve jurors ultimately selected were jurors 3, 8, 18, 22, 26, 28, 38, 39, 40, 41, 43, and 58. [Doc. 14-1 at TR-134]. Jurors 63 and 66 were selected as alternates. [*Id.*]. No prospective juror indicated during voir dire that he or she was familiar with Steven, and no prospective juror

indicated familiarity with Vanessa or with the facts of the case. [*Id*. at TR-31, TR-34]. The four prospective jurors who indicated that they knew members of the prosecution team—jurors 36, 72, 83, and 85—were not selected. [*Id*. at TR-28–29]. Likewise, of the eleven prospective jurors who indicated that they were familiar with one or more witnesses, ten were not selected. [*Id*. at TR-32–43 (jurors 7, 13, 16, 21, 49, 52, 55, 72, 85, and 101)]. The only selected juror who indicated familiarity with a witness was juror 41, who stated that she knew Sergeant Smith, Detective Prince, and Detective Scribner. [*Id*. at TR-39–40]. But juror 41 expressly indicated that she could remain fair and impartial and decide the case on the evidence. [*Id*. at TR-41].

The voir dire procedure itself also provided prospective jurors an opportunity to disclose information privately. Before questioning began, the court expressly instructed the panel:

> The purpose is to provide both sides with a fair trial. The best answer is always the most honest answer … So for that reason, if there is a question that you would like to answer privately, at the end of questioning, … we'll call you back individually into chambers to let you tell us privately what you would like for us to know. So please keep that in mind while you are being questioned.

[Doc. 14-1 at TR-27–28]. Eight prospective jurors availed themselves of that opportunity. [*Id*. at TR-109–16]. Only juror 100 reported that she was "very familiar" with Steven's family, and the court excused her for cause. [*Id*. at TR-111–12, TR-124]. Thus, the record demonstrates that the court offered prospective jurors an opportunity to disclose potentially prejudicial relationships privately and, when juror 100 disclosed such a relationship, excused her.

Nor does the record support Steven's suggestion that voir dire forced him to testify. In his state habeas petition, Steven asserted that three jurors had told defense counsel they would find him guilty if he did not testify because they would believe he was "hiding something." [Doc. 13-1 at 208–09]. The voir dire transcript, however, shows that the prospective jurors who expressed reservations about a defendant's decision not to testify were jurors 21, 23, 52, 63, and 83. [Doc.

14-1 at TR-100–05]. Only juror 63 ultimately served as an alternate. [*Id*. at TR-134]. And when juror 63 was asked whether she could remain fair and impartial, she responded, “I would be fair.” [*Id*. at TR-101]. Nothing in the record suggests that juror 63 participated in deliberations or otherwise influenced the verdict.

The record contains one additional indication that a juror recognized a witness after trial began. After Sheri testified, a juror reported that she recognized Sheri as a “[v]ery distant contact” whom she had not seen in approximately twenty years. [Doc. 14-3 at TR-34–36]. The juror further stated that the distant connection would not affect her verdict in any way. [*Id*]. Nothing in the record indicates that any other juror came forward during or after trial to report an undisclosed relationship with Steven or a witness.

In short, Steven identifies no juror on the deliberating jury who was unable or unwilling to decide the case impartially on the evidence. His argument instead rests on the proposition that any prospective juror who knew Steven or a witness should have been questioned privately and the failure to conduct such questioning necessarily deprived him of a fair trial. But the record does not establish the factual predicate for that proposition. The prospective jurors who disclosed potentially relevant relationships were either excused, not selected, or expressly affirmed their ability to remain impartial. The Court also notes that after Respondents argued this ground should be dismissed on the merits, Steven did not add any additional facts or arguments regarding this ground in his Reply. [*See* Doc. 21 at 1–3].

Accordingly, Steven has not demonstrated that the state court’s voir dire deprived him of his constitutional right to a fair trial before an impartial jury. Ground One therefore fails on the merits and should be denied.

**B. Ground Two: Insufficient Evidence to Support the Verdict**

Steven next argues that there was insufficient evidence to support his convictions for felony murder and conspiracy-to-commit-felony-murder. [Doc. 1 at 7]. Specifically, he contends that the only evidence of his culpability was the testimony of his ex-wife, Vanessa Lucero, "who admitted to being high on narcotics and who also admitted that she fabricated several statements she made prior to trial." [*Id.*]. Respondents do not dispute that Steven exhausted this claim, and the Court finds no exhaustion impediment. [Doc. 13 at 17].

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). In reviewing a challenge to the sufficiency of the evidence, the question is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). This standard does not permit a reviewing court to reweigh the evidence or substitute its own assessment of witness credibility for that of the jury. *See Messer v. Roberts*, 74 F.3d 1009, 1013 (10th Cir. 1996).

Because the state court adjudicated Steven's sufficiency claim on the merits, this Court's review is further constrained by the Antiterrorism and Effective Death Penalty Act (AEDPA). A federal court may grant relief only if the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d). Accordingly, a sufficiency-of-the-evidence claim is subject to a "twice-deferential standard": the Court must defer both to the jury's verdict under *Jackson* and to the state court's adjudication under AEDPA. *Parker v. Matthews*, 567 U.S. 37, 43

(2012) (per curiam); *Cavazos v. Smith*, 565 U.S. 1, 2, 4 (2011) (per curiam). The question is not whether this Court would have reached the same conclusion in the first instance, but whether the state court's rejection of the claim was objectively unreasonable.

On direct appeal, the New Mexico Supreme Court considered and rejected Steven's challenge to the sufficiency of the evidence supporting his felony-murder and conspiracy convictions. [Doc. 13-1 at 174–86]. In evaluating the felony-murder conviction, the court first examined the evidence supporting the predicate felony of armed robbery. It concluded that the State presented "overwhelming evidence" that Steven committed that offense. [*Id*. at 178–79].

As to intent to permanently deprive the owner of the property, the court relied on evidence that Steven planned to take Isaiah's truck for its parts, later removed parts from the truck, and installed the truck's engine and rims on his own vehicle. [*Id*. at 176]. The court also identified evidence that Steven drove away from the Maryland Street residence in Isaiah's truck, supporting the finding that he moved the property from the place where the owner had kept it. [*Id*. at 177]. As to the use of force or violence, the court relied on evidence that Steven and his brother attacked Isaiah and that Steven repeatedly stabbed him. [*Id*.]. Finally, the court concluded that the evidence supported a finding that Steven took the truck from Isaiah's person or immediate control by luring him to the residence, attacking him, and taking the truck. [*Id*. at 178]. The evidence that Steven later returned to the residence, stabbed Isaiah again, and took his wallet, shoe, and approximately fifteen dollars further supported the court's conclusion that the State had established the elements of armed robbery. [*Id*.].

The New Mexico Supreme Court next considered whether the evidence established that Isaiah's death occurred during the commission or attempted commission of the predicate felony. The court relied on evidence that Steven stabbed Isaiah during the initial attack, left the residence

with Isaiah's truck, and later returned and inflicted additional stab wounds after discovering that Isaiah was still alive. [*Id.* at 179–80]. The court concluded that the robbery and killing were sufficiently connected in time, place, and causal relation to constitute a continuous transaction. [*Id.* at 180]. The autopsy evidence was also consistent with Vanessa's account of the repeated stabbing. [*Id.*]. The court determined that the evidence was sufficient to establish that Isaiah died as a result of Steven's acts. [*Id.*].

The court further concluded that the evidence supported the jury's finding that the killing was willful and deliberate. It emphasized evidence that Steven lay in wait while armed with a gun and a knife, participated in a prolonged attack on Isaiah, and stabbed Isaiah again after realizing he was still alive. [*Id.* at 181].

With respect to conspiracy to commit felony murder, the New Mexico Supreme Court rejected Steven's challenge to the jury instructions and found them consistent with the applicable uniform jury instructions and precedent. [*Id.* at 184]. It also concluded that the evidence established that Steven and others participated in a scheme to deprive Isaiah of his property and to use deadly force if necessary. [*Id.* at 186]. The court therefore upheld the sufficiency of the evidence supporting both convictions. [*Id.*].

In subsequent state habeas proceedings, the trial court dismissed Steven's insufficiency claim because the New Mexico Supreme Court had already adjudicated it on direct appeal. [*Id.* at 217–18]. Thus, the state supreme court's decision is the relevant merits adjudication for purposes of this Court's review.

Steven has not demonstrated that the state supreme court's decision was unreasonable either objectively, legally, or factually. Viewed in the light most favorable to the prosecution, the evidence permitted a rational jury to find the essential elements of the offenses beyond a reasonable

doubt. The State presented evidence that Steven planned to take Isaiah's truck, participated in the attack that left Isaiah mortally wounded, took the truck, and later returned to inflict additional stab wounds while taking additional property. The evidence that Steven subsequently removed the engine and rims from Isaiah's truck and installed them on his own vehicle further supported the State's theory that the killing occurred in connection with the robbery. The jury could reasonably infer from this evidence that Steven participated in a coordinated effort to obtain Isaiah's property through violence and that the killing occurred during the commission of the robbery.

Steven's principal counterargument—that Vanessa was not a credible witness—does not warrant habeas relief. Vanessa acknowledged that she used methamphetamine on the night in question, lied to law enforcement, and made statements during the investigation that were inconsistent with her trial testimony. Those matters were before the jury, which had the opportunity to evaluate her testimony considering the inconsistencies and the other evidence presented at trial. *United States v. Dazey*, 403 F.3d 1147, 1159 (10th Cir. 2005) (weighing conflicting evidence and evaluating witness credibility "are the exclusive province of the jury"). Under *Jackson* and *Messer*, a reviewing court must defer to the jury's resolution of conflicts in the testimony and its assessment of witness credibility. *Jackson*, 443 U.S. at 319; *Messer*, 74 F.3d at 1013. The possibility that the jury could have disbelieved Vanessa, or that some aspects of her account were contradicted by other evidence, does not establish that no rational jury could have credited her testimony.

Moreover, the State's case did not rest exclusively on Vanessa's account. Steven admitted that he initially lied to Detective Scribner about how he obtained Isaiah's truck. Daniel Madison confirmed that Steven performed mechanical work at his shop and replaced the engine in his own truck. The evidence that Steven installed Isaiah's engine and rims on his vehicle corroborated an important part of Vanessa's account concerning the motive for the robbery and the disposition of

the stolen property. The autopsy evidence was also consistent with her description of the repeated stabbing. Although the evidence did not corroborate every detail of Vanessa's testimony, the jury was entitled to consider the evidence as a whole.

Under the deferential standards governing federal habeas review under 28 U.S.C. § 2254, Steven has not demonstrated that the New Mexico Supreme Court's rejection of his sufficiency-of-the-evidence claim warrants federal habeas relief for the following reasons. First, although the New Mexico Supreme Court did not expressly cite *Jackson v. Virginia*, its analysis is consistent with the governing standard. [*Compare Jackson*, 443 U.S. at 319, *with* Doc. 13-1 at 174–75]. The state court examined the evidence supporting the elements of the offenses and determined that the evidence was sufficient to sustain Steven's convictions. The absence of an express citation to *Jackson* does not establish that the state court applied a rule contrary to clearly established federal law. *See Early v. Packer*, 537 U.S. 3, 8 (2002).

Second, Steven has not rebutted the state court's factual findings by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Welch v. Workman*, 639 F.3d 980, 991 (10th Cir. 2011). In several places, the New Mexico Supreme Court characterized the evidence as establishing that Steven personally inflicted the fatal wounds. [*See* Doc. 13-1 at 171 (noting that Steven told Vanessa he had stabbed Isaiah again); *id*. at 180 (stating that Steven "exerted the fatal blow" and that Isaiah died as a result of Steven's own acts); *id*. at 181 (stating that Steven made a derisive comment about Isaiah's survival before finishing him off); *id*. at 185 (stating that Steven inflicted the fatal blow)]. The trial transcript, however, reflects some ambiguity concerning who delivered the additional stab wounds.

During Vanessa's testimony, the prosecution asked what Steven had said after returning to the residence:

**Attorney:** What did Steven actually say?

**Vanessa:** That fucker was still breathing.

**Attorney:** What did he say after that?

**Vanessa:** ***They*** had stabbed him again.

**Attorney:** That Steven said that ***they*** had stabbed him again?

**Vanessa:** (Nods head.)

**Attorney:** Did he say anything else after that?

**Vanessa:** No.

[Doc. 14-1 at TR-202] (emphasis added).

This exchange indicates that Vanessa attributed the additional stabbing to Steven and Gilbert collectively, rather than unequivocally identifying Steven as the person who delivered the final wound. The State's opening statement likewise did not identify who inflicted the final wounds during the second visit to the residence. [*See* Doc. 14-1 at 157]. In closing argument, the State acknowledged that "they" stabbed Isaiah again after Steven and Gilbert returned and discovered that Isaiah was still breathing. [*See* Doc. 14-3 at 67, 77].

This distinction does not, however, undermine the state court's ultimate conclusion that the evidence was sufficient to support Steven's felony-murder conviction. The evidence established that Steven and Gilbert participated in the initial attack, left the residence with Isaiah's truck, and subsequently returned to find Isaiah still alive. Vanessa's testimony further established that the two men stabbed Isaiah again before leaving with additional property. Thus, even if the record does not conclusively establish that Steven personally delivered the fatal blow, it supports the finding that he participated in the acts that led to Isaiah's death during the commission of the robbery. Consistent with the jury instruction requiring the State to prove that Steven caused Isaiah's death,

[Doc. 13-1 at 8], a rational juror could have found this element satisfied based on the evidence of Steven's participation in the attack and the subsequent stabbing, even without determining which participant inflicted the fatal wound.

As the New Mexico Supreme Court explained, under *State v. Harrison*, the requisite causal connection exists when death results from "those acts of [the] defendant or his accomplice initiating and leading to the homicide without an independent force intervening." [Doc. 13-1 at 180 (citing *State v. Harrison*, 1977-NMSC-038, ¶¶ 10–11, 90 N.M. 439, 564 P.2d 1321, superseded on other grounds as stated in *Tafoya v. Baca*, 1985-NMSC-067, ¶ 17, 103 N.M. 56, 702 P.2d 1001)]. Under that reasoning, the relevant inquiry is not limited to identifying which participant inflicted the final wound, but whether the evidence established the requisite causal connection between the criminal acts and Isaiah's death.

Accordingly, even if the state court overstated the evidence that Steven personally inflicted the fatal blow, Steven has not demonstrated that this discrepancy renders the state court's ultimate determination unreasonable under 28 U.S.C. § 2254(d). Nor has he rebutted the pertinent factual findings by clear and convincing evidence, as required by § 2254(e)(1). The discrepancy therefore does not provide a basis for federal habeas relief.

In sum, the record contains evidence from which a rational jury could find beyond a reasonable doubt that Steven committed felony murder and conspired with others to commit the underlying offense. The New Mexico Supreme Court considered the relevant evidence and applied the governing sufficiency principles in rejecting Steven's challenge. Steven has not shown that its decision was contrary to, or an unreasonable application of, *Jackson*, or that it rested on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

Additionally, Steven's argument that his brother, Gilbert, was acquitted while Steven was convicted does not establish that the evidence was insufficient to support Steven's convictions. Their trials differed in meaningful respects, as discussed below. The relevant inquiry is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crimes charged against Steven beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. That standard is satisfied here. Accordingly, a comparison of the two trials is unnecessary to resolve Steven's sufficiency-of-the-evidence claim.

Accordingly, Ground Two fails on the merits and should be denied.

**C. Ground Three: Ineffective Assistance of Counsel**

Steven next argues that Robert Tangora provided ineffective assistance by failing to call Timothy and Michelle Emerson, who allegedly possessed exculpatory information, and Maria Torrez, whom Steven identifies as an alibi witness. [Doc. 1 at 8]. Respondents do not dispute that Steven exhausted this claim, and the Court finds no exhaustion impediment. [Doc. 13 at 17].

When evaluating a claim of ineffective assistance of counsel, a court must determine whether a petitioner has shown (1) that counsel's representation fell below an objective standard of reasonableness, and (2) it is reasonably probable that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). The reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *id.* at 689; it is not enough to show that the representation "deviated from best practices or most common custom," *Harrington*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690). On review under § 2254(d), this standard is "doubly" deferential and the relevant question is not whether counsel's actions were reasonable,

but "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*.

The sole purpose of the April 30, 2021, state habeas evidentiary hearing was to address Steven's claim that Tangora provided ineffective assistance by failing to call the Emersons and Maria Torrez as witnesses at trial. At the hearing, defense counsel called Maria Torrez and Steven to testify, while the State called Detective Scribner. [Doc. 15; Apr. 30, 2021, CD at 1:48:50–2:25:44, 2:25:45–2:38:51]. Tangora, Steven's trial counsel, did not testify because he had passed away. [*Id*. at 3:20:00–3:20:15].

*i. <u>The Emersons</u>*

Steven argued Tangora performed deficiently by failing to call Timothy and Michelle Emerson at trial. According to Steven, the Emersons would have testified that Vanessa did not have permission to take their Chrysler on the night of the murder, that Mr. Emerson did not notice the vehicle was missing when he left for work, and that they never discovered blood inside the vehicle. [*Id*. at 2:48:55–2:49:50]. Steven contends that this testimony would have undermined Vanessa's credibility because she was the State's primary witness and testified that she had taken the Chrysler that night. [*Id*. at 2:47:50–2:48:54].

The State acknowledged that the Emersons' testimony could have helped undermine the credibility of Vanessa's account but argued that it also carried significant risks. Specifically, their testimony could have undermined the defense theory that Steven had no reason to steal the victim's truck. If Mr. Emerson testified at trial, it would have opened the door to testimony that he helped load Steven's truck, which had a blown motor, and transport it to an address on Galinda Road, where other parts of the victim's vehicle were found. He also would have testified that Vanessa was present during that incident. This testimony could have corroborated Vanessa's account and

supported the State's theory of motive. It also could have undermined Daniel Madison's testimony that Steven's vehicle was operational and that he drove it to and from work each day, thereby suggesting that Steven had no need for a replacement motor. [*Id*. at 3:13:17–3:17:05].

The state habeas court concluded that, although the Emersons' testimony could have bolstered the attack on Vanessa's credibility, it also would have contradicted Steven's trial testimony and undermined a central aspect of the defense strategy. [Doc. 13-1 at 288; *see also* Doc. 15; Apr. 30, 2021, CD at 3:06:59–3:07:24]. In particular, the court reasoned that their testimony could have sabotaged the defense theory that Steven had no reason to steal the victim's truck. [Doc. 13-1 at 288]. It therefore found that Tangora's decision not to call the Emersons was "sound." [*Id*.].

That conclusion was not objectively unreasonable. The decision whether to call a particular witness ordinarily falls within trial counsel's strategic discretion. *Ellis v. Raemisch*, 872 F.3d 1064, 1087 (10th Cir. 2017). Although the Emersons' testimony might have undercut certain aspects of Vanessa's account, it also would have corroborated other aspects of her testimony and supported the State's theory that Steven had a motive to kill Isaiah, in part, to take his truck to obtain a replacement for his own inoperable motor. The fact that another attorney might have made a different strategic choice does not establish deficient performance under *Strickland*, much less demonstrate that the state habeas court unreasonably rejected Steven's claim under § 2254(d).

*ii.* *<u>Maria Torrez</u>*

Steven also contends that Tangora was ineffective for failing to call Maria as an alibi witness. At the state habeas hearing, Maria testified that she was Steven's friend and that he stayed with her in the same room on the nights of June 3, 4, and 5, from approximately 6:30 p.m. until 7:00 a.m. [Doc. 15; Apr. 30, 2021, CD at 1:53:02–1:53:24, 1:56:49–1:57:18, 2:03:05–2:04:03]. Steven testified that he informed Tangora of Maria and her willingness to testify but that Tangora

nevertheless failed to call her as a witness. [*Id*. at 2:12:00–2:12:38, 2:14:00–2:15:42; *see also* Doc. 13-1 at 256]. The State challenged the credibility of this account on several grounds.

First, Steven's notice of alibi identified Trina Torres, not Maria, as the relevant witness. [Doc. 13-1 at 3]. Trina was Maria's first cousin and was dating Steven at the time. [Doc. 15; Apr. 30, 2021, CD at 2:01:40–2:02:10, 2:09:50–2:11:20]. Steven was also involved with his former wife, Vanessa, who was staying at the Emersons' residence. [*Id*. at 2:32:06–2:32:30]. According to the hearing testimony, although Steven stayed at the Emersons' residence with Vanessa during the relevant period, he used the residence on the nights of June 3 through June 5 only to shower and change clothes after work before immediately driving to Maria's residence. [*Id*. at 2:19:42–2:23:40]. The testimony also indicated that Trina was not at the Emersons' residence or Maria's residence during those nights. [*Id*. at 2:31:48–2:32:32, 2:04:23–2:04:37]. Maria also apparently was unaware of any relationship between her cousin Trina and Steven. [*Id*. at 2:01:59–2:02:10]. The discrepancy between the witness identified in the notice of alibi and the witness who later testified as Steven's purported alibi raised questions about the reliability of his account.

Second, the State argued that Maria's proposed testimony conflicted with Steven's own trial testimony. On redirect examination, Tangora asked Steven only one question, "[Steven], do you recall where you were on that evening of June 4th, 2014?" Steven responded, "No, I can't recall where I was." [Doc. 14-3 at TR-32]. The state habeas court found it "fantastical" that Steven would have failed to identify Maria as an alibi witness at trial if he had, in fact, been with her during the relevant period. [Doc 15; Apr. 30, 2021, CD at 3:20:44–3:21:25]. The court reasoned that even if Tangora had advised Steven not to mention Maria because she was incarcerated at the time, Steven could have disregarded that advice and identified the person and location that supposedly established his alibi, rather than committing perjury by denying knowledge of his

whereabouts. [*Id*. at 2:17:30–2:17:37, 2:17:45–2:18:06, 3:18:30–3:21:25]. This perjury undermines his credibility, particularly considering his admission that he had lied to law enforcement and the fact that his notice of alibi identified an individual whom he now claims was not with him on the relevant dates. [*Id*. at 3:10:58–3:13:17, 3:22:09–3:23:01].

Third, the State emphasized that Steven did not identify Maria as an alibi witness during the investigation. [*Id*. at 2:18:06–2:18:29]. Detective Scribner testified at the state habeas hearing that he had never heard of Maria throughout the entirety of the investigation and that he would have "absolutely" investigated an alibi witness, which would have been "priority one", had an alibi witness been brought to his attention. [*Id*. at 2:31:21–2:31:48, 2:32:36–2:32:55]. Steven responded that, when Detective Scribner advised him of his rights on July 17, the detective had said only that he had been investigating the murder since June 4 but did not indicate the date the murder had occurred. [*Id*. at 2:24:34–2:25:26, 2:31:09–2:31:21]. Steven argued he could not have known which date to address when offering an alibi. [*Id*. at 2:33:40–2:37:16]. The state habeas court nevertheless rejected Steven's account and found neither Steven nor Maria credible. [Doc. 13-1 at 289].

These credibility findings provide a reasonable basis for rejecting Steven's ineffective-assistance claim. The discrepancy between the notice of alibi and Maria's testimony, Steven's failure to identify Maria at trial or during the investigation, and the inconsistency between his trial testimony and his later alibi account all undermine the reliability of the proposed alibi. Moreover, the state habeas court's credibility determinations are entitled to deference. Steven has not shown that those findings were unreasonable in light of the record nor rebutted the presumption of correctness by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Given these findings, Steven has not established a reasonable probability that Maria's testimony would have changed

the outcome of his trial. Nor has he demonstrated that the state habeas court unreasonably applied *Strickland* in rejecting this claim.

*iii. Gilbert's Acquittal*

Steven further argues that the differences between his trial and his brother Gilbert's trial support his claim of prejudice. Gilbert was acquitted, and Steven contends that Gilbert's defense benefited from a weak alibi witness, whereas he could have provided a strong alibi witness, and testimony from the Emersons that undermined Vanessa's account of borrowing their Chrysler. [Doc. 13-1 at 260–62]. According to Steven, the Emersons' testimony was the principal difference between the two trials and demonstrates that Tangora's failure to call the Emersons and Maria prejudiced his defense. [Doc. 15; Apr. 30, 2021, CD at 2:47:46–2:50:40, 2:53:00–2:55:25].

The State responds that the trials differed in several material respects. First, Gilbert was tried after Steven and therefore had the opportunity to observe the evidence and testimony presented at Steven's trial. Second, unlike Steven, Gilbert did not make statements to law enforcement. Consequently, Gilbert's trial did not include evidence that he had lied to law enforcement, as Steven's trial did.[3] Third, items belonging to the victim, Isaiah, were found in Steven's possession but not in Gilbert's. Finally, Steven testified that he could not recall where he was on the night of the murder, whereas Gilbert presented an alibi. [Doc. 15; Apr. 30, 2021, CD at 2:56:00–2:57:08, 3:02:05–3:02:37].

These differences undermine Steven's contention that Gilbert's acquittal establishes a reasonable probability of a different outcome in Steven's case. The fact that a different defense

[3] Steven, after being Mirandized, voluntarily told Detective Scribner that he obtained the victim's truck from a man named Richard but that he could not remember Richard's last name. [Doc. 14-3 at TR-30; Doc. 15; Apr. 30, 2021, CD at 2:27:45–2:30:56]. He later testified at trial that Vanessa had given him the truck. [Doc. 14-3 at TR-31]. Steven made other questionable statements to Detective Scribner weighing on his credibility such as claiming he had never heard of a man named Isaiah Sanchez before even though he knew that Isaiah was Vanessa's ex-boyfriend. However, at trial he stated "I just didn't recognize the name at the time he was asking me." [Doc. 14-3 at TR-30].

strategy may have contributed to Gilbert's acquittal does not establish that the omitted testimony would have changed the result of Steven's trial. The relevant inquiry remains whether there is a reasonable probability that the outcome of Steven's proceeding would have been different absent counsel's alleged errors. *Strickland*, 466 U.S. at 694. In light of the state habeas court's credibility findings and the potential strategic costs of presenting the Emersons' testimony, Steven has not made that showing.

Ultimately, Steven has not established that the state habeas court unreasonably rejected either component of his ineffective-assistance claim. The court reasonably concluded that the Emersons' testimony carried strategic risks and that Steven had not established a credible, prejudicial alibi through Maria. At a minimum, there is a reasonable argument that Tangora's decisions fell within the range of professionally reasonable representation. *Ellis v. Raemisch*, 872 F.3d 1064, 1087 (10th Cir. 2017) (recognizing that the decision whether to call a particular witness ordinarily falls within trial counsel's strategic discretion). Steven has likewise failed to establish that the state court's prejudice determination was unreasonable under *Strickland*.

Accordingly, Ground Three fails on the merits and should be denied.

**D. Ground Four: Prosecutorial Misconduct and Vindictive Prosecution**

*i. <u>Exhaustion Requirement</u>*

Steven further argues the "prosecution injected unsubstantiated evidence and testimony from its key witness Vanessa Lucero Valdez to the jury" which was "highly prejudicial to the defendant." [Doc. 1 at 10]. He further contends that the prosecutors improper vouching for the credibility of Vanessa "tainted the jury trial." [*Id.*].

This Gound was presented in Steven's *pro se* state habeas petition as a "cognizable claim[] to be raised[,]" [*see* Doc. 13-1 at 208], was arguably summarily dismissed, [*see id.* at 217–19], and

was not pursued in either the amended state habeas petition or Steven's subsequent petition for writ of certiorari, [*see id*. at 252–72, 300–07]. Although there is likely an exhaustion impediment, because this Ground can be easily dismissed on the merits, the Court will do so. *See Revilla*, 283 F.3d at 1210–11 (permitting a federal court to bypass a difficult exhaustion question and deny an unexhausted claim on the merits when the claim plainly lacks merit); *see also* Doc. 13 at 16–17 (Respondents' requesting the Court bypass the potential exhaustion issue in favor of making an easy ruling on the merits).

*ii. Analysis on Unsubstantiated Evidence*

Improper conduct by the prosecuting attorney may be a basis for federal habeas relief if it "so infect[ed] the trial with unfairness as to make the resulting conviction[s] a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). The habeas petitioner bears the burden of demonstrating misconduct. *Newsome v. T.B. Hatch*, No. Civ. 08-1180 MCA/RHS, 2011 WL 13284728, at *14 (D.N.M. Sept. 1, 2011).

As Respondents correctly argued, this claim must be rejected as impermissibly vague and conclusory. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) ("[C]onclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based."). Steven fails to identify what evidence was unsubstantiated and the Court finds many aspects of Vanessa's account were substantiated by other witnesses. For example, Dr. Sam Andrews testified that Isaiah was stabbed and beaten to death, [*see* Doc. 14-2 at TR-51, TR-55–60, TR-65], Detective Scribner testified that Isaiah was found wearing only one shoe, [*see id*. at TR-84], Daniel Madison testified that Steven switched out the engine from Isaiah's truck to Steven's truck at Daniel Madison's shop, [*see id*. at Tr-25–35], and Edward Sanchez testified the rims from Isaiah's truck had been installed on Steven's truck, [*see id*. at TR-134]. Accordingly,

this conclusory allegation is without merit and fails to demonstrate that the prosecutions' acts infected the trial with unfairness.

*iii. Analysis of Improper Vouching*

"Vouching typically 'occurs when the jury could reasonably believe that the prosecutor is indicating a personal belief in the witness' credibility, either through explicit personal assurances of the witness' veracity or by implicitly indicating that information not presented to the jury supports the witness' testimony.'" *Stillwagon v. Martin*, 2021 WL 3826557, at *3 (10th Cir. Aug. 27, 2021) (*quoting Hanson v. Sherrod*, 797 F.3d 810, 837 (10th Cir. 2015)); *see also State v. Paiz*, 2006-NMCA-144, ¶ 55 ("Generally speaking, vouching involves either invoking the authority and prestige of the prosecutor's office or suggesting the prosecutor's special knowledge.") (internal quotation marks omitted); *United States v. Rivas*, 493 F.3d 131, 137 (3rd Cir. 2007) ("[V]ouching occurs only where the prosecutor implicitly refers to information outside the record.").

Steven's improper-vouching claim may also be rejected as conclusory. In any event, the record contains no indication that the prosecution expressed a personal belief in Vanessa's truthfulness or suggested that it possessed information outside the record that supported her credibility. Steven identifies no evidence to the contrary.

Because Steven raises this claim for the first time in Ground Four of his Petition, the Court reviews it *de novo*. Under that standard, the claim fails because Steven has not demonstrated that the prosecution's conduct rendered his trial fundamentally unfair in violation of the Constitution. The claim would also fail under a deferential standard of review because the United States Supreme Court has not held that improper prosecutorial vouching, standing alone, violates due process. *See Revilla v. Whitten*, 2024 WL 36462, at *5 (W.D. Okla. Jan. 3, 2024).

Accordingly, Ground Four fails on the merits and should be denied.

**E. Certificate of Appealability**

A state prisoner must obtain a certificate of appealability to appeal the denial of a habeas petition. *Montez v. McKinna*, 208 F.3d 862, 866–67 (10th Cir. 2000). To obtain a certificate of appealability, a petitioner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To make this showing, a petitioner must "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Steven has not made this showing. This ruling is not reasonably debatable and therefore I recommend the Court deny a certificate of appealability.

## IV. CONCLUSION

Federal habeas relief is precluded as to each of Steven's claims because, at a minimum, fairminded jurists could disagree about the correctness of the state court's decisions on the merits. *Harrington*, 562 U.S. at 101. For the reasons discussed above, I recommend the Court DENY Steven's Petition, DENY a certificate of appealability, and DISMISS this matter with prejudice.

HON. JERRY H. RITTER
United States Magistrate Judge

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition, they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the 14-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**